Mr. Justice Scott delivered the opinion of the Court. The case made by this bill, to which a demurrer was interposed, is in substance this : The complainants seek the enforcement of an equitable interest in a contract, which they claim as trustees for creditors and ask the aid of the chancellor to realize for the use of the beneficiaries the amount of a judgment at law against the defendant’s intestate rendered by the circuit court of Chicot county, in his life time, in favor of Duncan who assigned the same to Ware by whom it was assigned to the complainants in trust. They allege that, within two years after the death of thede- ■ fendant’s intestate, this judgment was regularly presented and was allowed against his estate by the Probate court of Chicot county: that soon afterwards, all the records of the Circuit and Probate courts of Chicot county and all the papers connected with this judgment and its allowance and classification were stolen from their respective clerk’s offices and have been wholly lost; and that parol evidence only remains either to establish said judgment or allowance and classification i and that although the defendant has ample means unappropriated, that are subject to the payment of this demand, no part of the same has ever yet been paid and he wholly refuses to recognize or pay it; alleging as an excuse therefor that the complainants have no claim or evidence of any claim for payment out of the abundant assets of said estate in his hands as representative. The complainants’ right to relief is contested in this court upon a single ground only ; and that is, that a lost judicial record cannot be set up and established by parol evidence. It is insisted that this proposition is sustained, not only by high authority, but that it is based upon overwhelming considerations of public policy and necessity: that to establish the opposite would not only assail every law that has been framed for the purpose of removing the temptation to perjury and for lessening the dangers to society from that source, but that it would, at the same time, strike a blow at the sanctity of records so disaster* ous that, in contemplating the evils that would inevitably flow into the body politic from the operation of such a rule, it would be clearly far better that individuals should submit in meekness to the loss of their judgments — which, it is admitted, would be the inevitable consequence, because such evidence would be alike incompetent in a court of equity — than that the public should suffer so great evils, going, as seems to be supposed, to the very foundations of the social compact itself. We propose first to examine the latter branch of this category and ascertain, if we can, whether or not these eminent considerations are indeed involved in this question. It is known that, not only the existence and loss, but also the contents of lost bonds, bills, notes and other memorials of contracts and various other written instruments of evidence from time immemorial have been allowed to be proven by parol evidence. And that many of these relate to the most important transactions among men, and that they are in general executed in privacy and comparatively bat few of them are ever submitted to the public gaze. And yet the inquest of centuries has failed to present this rule of evidence to the legislature as a public grievance in promoting the crime of perjury and for this reason to demand its eradication from our municipal regulations. If then the morals and safety of society have received no serious injury from its operation in a wide field of temptation, where the suborned are, for the most part, unchecked by the public eye, can it be possible that the admission of parol evidence of the loss and the effect of judgments at law, which are not produced in private like these private instruments of evidence, but are the result of the united action of the judge, jury, officers of court, parties, their attorneys and witnesses, all under the eye of the by-standers, can be productive of the great evils apprehended from “this source ? On the contrary, is it not certain that of all the cases of the proof, by parol, of the contents of lost instruments of evidence, that of lost j udgments, from the circumstances to which we have alluded, is most secured against the crime of perjury ? But it is supposed that a disastrous blow would be stricken against the sanctity of records, and in this, that public policy would be greatly outraged. If records, while they existed, were allowed'to be contradicted or established by parol this would not fail to be the result. But how this is to result from the establishment of their tenor and effect when destroyed is not altogether so clear. Surely judicial records are not so sacred that their very ashes must not be disturbed, and that, to minister to their quiet, the most important rights of men must be sacrificed, with Pagan superstition, to their manes. Such a doctrine would have better befitted the days of the old Barons of England, when chirography was so much esteemed that it was an indulgence for crime, than our times; and it is by no means certain that it obtained even in those days. Shall personal liberty be sacrificed at this altar and a man be twice put in jeopardy of life or limb because his plea of former acquittal cannot be established by the ashes of a conflagrated record ? Shall a man be twice punished for the same offence because the record of his former conviction, under which he was punished, from its destruction cannot be produced to protect him from a second prosecution ? Or shall the convicted forger be delivered from the penitentiary and set at large upon society because the same incendiary flame, that destroyed the record of his conviction, at the same time consumed the material evidence of his guilt! But these and many other startling consequences are by no means the only result of this supposed doctrine. For let it be distinctly understood that the destruction of judicial records is the end of the public and private rights depending upon them while they exist, and at once a high premium for vice and crime is held out by the law, under the influence of which just fears might be apprehended for the safety of judicial records. Then it cannot be that public policy will be promoted by the unmooring of all these elements of disorder or that the social compact is to be cemented and sustained by any such disrupting influences. But the very oppositeis so palpably true that its delineation were a work of supererogation. What then is the error of the hypothesis ? It is clearly in assuming for the operation of the undoubted rule with regard to the sanctity of records, a field beyond its scope in the assumption that the rule is to continue to operate after the records themselves have ceased to exist. In combating this position we are far from desiring to invade the legitimate rule, or to lessen, in the least, the veneration that its antiquity inspires. For, not only does it deeply concern the administration of justice that every distinctive rule of right shall be preserved, but, in no little degree, that every orderly sentiment of our nature, that can be available to the ends of justice, shall be perpetuated with no less care. And in doing so, we shall first glance at the question upon general principles and then look to the authorities; and shall express our views with the more freedom because the authorities by no means harmonize. Records are said by Lord Coke to be “ The rolls or memorials of the judges of the courts of record, and import in themselves such uncontrolable verity that they admit of no averment to the contrary.” (Coke Litt. 260.a.) Their nature then is but that of muniments of truth of such high character that they import of themselves absolute verity, and consequently when a matter is alleged that is of record, there can be no higher evidence of the existence of such matter than the record itself. The principle, upon which the law regards records as of such absolute verity that they cannot be contradicted, is obvious. They are memorials of the end of strife when a dispute has been settled by the judgment of the court. If it were otherwise it would be difficult to see where litigation would end; and as the administration of j ustice is entrusted to the courts it must be taken for granted that what they have done, in a matter submitted to their jurisdiction, and which they have committed to record, must be rightly done unless it has been reversed in the manner prescribed by law. Were it otherwise confusion and disorder would ensue. So Blackstone says “ A debt of record is a sum of money which appears to be due by the evidence of a court of record. Thus, when a specific sum is adjudged to be due from the defendant to the plaintiff on an action or suit at law, this is a contract of the highest nature, being established by the sentence of a court of judicature.” And thus he, in effect, reiterates the doctrine that the record of a judgment is evidence not only of the sum of money due from the defendant to the plaintiff but also that that indebtedness has been legally established, so that the indebtedness cannot again be disputed, and thus the grade of indebtedness has been raised to the highest point. First, it may have been an indebtedness by simple contract; then its evidence lay in parol. Secondly, it may have become a bond debt, then its evidence lay in the writing under seal, and lastly, it became a judgment debt, and its evidence lay in the record. In neither case however was the debt and the evidence by which it was shown to exist identical, so that by the destruction of the evidence the debt would thereby necessarily be destroyed. The record then, although the very highest grade of evidence known to the law, is nevertheless simply an instrument of evidence and but performs the office of a perpetual memorial of the truth touching the matter to which it relates. And this proposition seems too plain to require argument or amplification, as it is the inevitable result of the nature and object of a record. And when regarded in this light, the source of the rule, which excludes parol evidence of matters of record, is seen, at a glance, in that policy of the law which prohibits the use of secondary evidence when primary is accessible. This general rule of exclusion is based upon no supposed inherent incapacity of parol evidence to present truly that which may be preserved by writing. Nor upon any notion that that, which may be preserved in writing, cannot in the nature of things be a misrepresentation of facts, but it is based upon tlie ground simply of the greater probability of the accuracy of that which may have been committed to writing as a memorial of truth. Hence this rule of exclusion is not absolute but qualified and its operation is commensurate only with the reasons upon which it is based and consequently when in a given case the reason of the rule has ceased, as by the loss or destruction of a deed, for instance, pa-rol evidence is no longer inadmissible to prove the contents of such deed. And if this was not so injustice and disorder would ensue as upon the operation of any unreasonable rule.. Such is the general rule and its qualification. But it is insisted that, as to judicial records, it is absolute. This can not be maintained upon any reason drawn from the nature of records, because we have seen that, in their nature, they are but instruments of evidence of the highest grade : nor upon the ground of any inherent incapacity of parol evidence to develop the truth, for none such is known to the law; on the contrary, as we have seen, testimony is never rejected except when and so long as there may bo a probability of the, existence of more reliable evidence. Nor upon any ground of inherent difficulty in establishing by parol the facts that were shown by the record before its loss or destruction, or of suspicion of the verity of the parol evidence offered for this purpose; for in the nature of things, as records are made in public, greater facilities are manifest for the establishment of their contents than for the contents of most other lost instruments of evidence, and for the same reason the parol evidence comes in a more creditable form as the facilities for perjury are thereby lessened. Nor upon any principle of natural justice, for we have seen that the most inestimable rights must be sometimes sacrificed. Nor upon any ground of public policy, for we have seen that none that looks to the good order and well-being of the body politic can be advanced by the sacrifice of judicially ascertained rights and the offer of a premium for crime. Then there would seem to be no reason left for its support but a supposed technical arbitrary rule founded possibly upon some antiquated idea of monkish times. Upon principle then it seems manifest that the rule with regard to the sanctity of records, which does not admit of their contradiction at all, and which allows of their proof only by the record itself, excluding all other evidence whatsoever, cannot have legitimate operation beyond the period of the loss or destruction of the record. And if this were otherwise that which was designed for the perpetuation of truth and the establishment of justice would be perverted to the extinguishment of the light of the one and the overthrow of the other. And the law would be placed in the singular predicament of openly permitting the rude hand of crime to seize upon her highest muniments of truth and right, apply the incendiary torch and hold the blazing sacrifice in the very face of justice. We cannot think that such a scene can be enacted under the auspices of the common law, whose oracles have ever claimed for it a capacity to afford a remedy for every wrong. On the contrary; we think that its recuperative energies are fully equal to the work of setting up, by the legitimate operation of its harmoneous rules, every land mark of truth and right, that may be at any time prostrated, either by the hand of crime, the inevitable accidents incident to men or by the onward wear of time. And if these wastes could not be thus repaired, this system of jurisprudence would fall so far short of its great prototype, the laws of Revelation and of nature, in which restoration has such conspicuous place, that for this reason alone, it would as little deserve our accustomed veneration as the swelling praise of the great commentator. Nor in the light of these views can any intermediate ground be occupied with any show of reason or justice, as that parol evidence may be admitted to establish the effect of a lost judicial record, when brought incidentally or collaterally in question, but must be absolutely excluded when the lost record itself is directly in question or is the sole foundation of the proceeding, because every reason natural or artificial that can have place on the direct question of admissibility, when that question is to be settled on the strict rules of law for the development of truth, will apply with equal force to each of these two predicaments. There may be, however, somewhatof reason (but doubtless more of convenience sanctioned by usage in analagous cases) for relaxing the strict rules for the development of the truth by evidence, in cases where the contents of the lost record may come collaterally in question, and in this respect distinguish such cases from those where the lost record is the sole foundation of the proceeding. But there is no reason at all to argue from this foundation that parol evidence is not admissible at all, when the lost record is the sole foundation of the proceeding. The premises and the conclusion have no connexion with each other whatsoever. Take for illustration, the proof of marriage. When that comes collaterally or incidentally in question, it is by no means necessary to prove marriage in fact either by the production of the register of marriages or by some person, who was present at the ceremony. But this relaxation of the rules for the development of truth by evidence by no means proves that marriage in fact could not be established by the highest evidence in existence, when that question might come directly in issue or be the sole foundation of the proceeding, as in an action for crim. con.; and could not be proven at all in such an action if the direct evidence was a record of marriages and that no longer existed. And there may perhaps be a technical reason for the exclusion of parol evidence to establish a lost judicial record, when the trial is by the court, that would not exist if the trial was by jury, founded upon the old rule that “ the judges cannot judge of are-cord given in evidence if the record be not sub pede sigilli, that is, exemplified under seal; but a jury may find a record although it be not so, if they have a true copy proved to them or other matter given them in evidence sufficient to induce them to believe that there was such a record. (Patch. 23 Car.B.R.) For the judges are to judge only de existentibus ct appurentibus, but the jury are induced in their consciences by things given in evidence which are but probable for the most part, and accordingly they give their verdict. (2 Vol. Lilly's Abridg. p. 420, 421.) And it is upon the foundation of these two distinctions that some ofthe adjudged cases are to be reconciled with the law, which apparently give color to the supposed difference in the rule of admissibility when the lost record is directly, and when it is only collaterally in issue. Nor can there be upon principle any well defined and reasonable ground of distinction pointed out and sustained between those cases where upon some trifling basis as a mere germ, of questionable character to say the least, such as the merest memorandum upon a docket prepared by the clerk for the use of the bench and the bar, sometimes whole records, and often wholly independent portions of them have been established or reproduced upon the faith alone of parol evidence; and that class of cases where the entire record has been lost or destroyed. We know that such cases are always placed upon the ground that there is something to amend by, but every lawyer will concede that in many of these cases this is but a catch-word, and that in its application to the particular record established or reproduced, it is as unmeaning as the distinction itself, which we challenge. The authorities, as we have already remarked, are by no means harmonious. We have therefore looked more closely to principle’and the analogies of the law. We are not however without high authority to sustain our views, and we will proceed presently to cite them; but will first premise that those which sustain the opposite, along with some that, to a greater or less extent, sustain the position that we have taken, are cited in the brief of the appellant’s counsel. And of those which militate against our views is the case of Smith vs. Dudley, decided by this court in the year 1330 and reported in 2 Ark.p. 60. Several of ‘ the authorities seem not to have been before the court when that case was decided; and it would seem from some expressions in the opinion that it was perhaps more from a want of express authority to sustain the opposite, than a conviction of the correctness, upon principle, of the doctrines declared, that produced that decision under the influence of the adjudged cases before them. The court seeming to lay great stress upon the fact that, in their researches, they had not been able to find a single case where the question had arisen in a direct proceeding upon a lost judicial record and therefore “in a total absence of all direct authority” they did not feel at liberty without legislative provision to go further than to hold that a lost judicial record might be proven by a duly certified copy from the rolls, and that it could not be proven by parol. And this doctrine was repeated in the subsequent cases of Williams vs. Brummell, (4 Ark. 129) and Bailey vs. Palmer, (5 Ark. 208,) on the authority of Smith vs. Dudley; but the question was not in those cases re-examined. Afterwards, in the case of Fowler vs. More, (4 Ark. 570,) where the circuit court had permitted a lost writ of summons, and the return upon it to be supplied by parol evidence alone, it was objected that this could not be done consistently with the doctrine of Smith vs. Dudley; but the court held the writ and return well supplied and parried the objection by regarding such substitution as apoint of practice merely, and resting it on grounds of necessity to prevent the failure of justice from official dereliction. In the case of The Mayor of Hull vs. Horner, (1 Cooper R. 109) where the court presumed the existence of a record which could not be found, Lord Mansfield remarked “ If a foundation can be laid that a record or a deed existed and was afterwards lost it may be supplied by the next best evidence to be had, or if it cannot be shown that it ever existed, yet enjoyment under a title which can only be by record is strong evidence to be left to a jury that it did once exist. I do not know an instance in which proof may not be supplied.” This case (and there are numerous others of the same kind both English and American) shows that, in favor of long possession, a grant or charter, which ought to be matter of record, will be presumed, and so will acts of Parliament, grants, judgments, releases and patents. (1 Jac. & Walk. 63. 2 Wend. 14. 2 Ves. jr. 583. 11 East 284.) And the remarks of Lord Mansfield show that he placed deeds and records on the same ground as to the evidence necessary to establish their effect when lost. And the same is strongly intimated in the case of Ludlarn on the demise of Hunt, decided the year before (Mec. 13 Geo. 111. B. R. 1 Gilb. Ev. 5 note) where the question arose whether a copy of a will, on which the title turned, could be produced from the Register of the Ecclesiastical court, Lord Mansfield said: “ The case is clear; a man by losing the evidence of his title shall not lose his estate; the rule in all cases holds to take the best evidence which the case, rebus sic stantibus, according to the real circumstances, will admit. If you cannot prove a deed by producing it, you may prove the counterpart; if you cannot produce this, you may produce a copy, even if you cannot prove it to be a true copy, but you must prove it cy-pres as the case will admit; and if a copy cannot be produced you may go into parol evidence of the deed.” In a case in 2 Burrows 722, where there had been a neglect for thirty years to enter a judgment, on this and a loss of the roll being sufficiently shown, Lord Mansfield made a rule “ That the clerk of the judgments shall sign a new roll wherein is to be entered the judgment signed in this case in Michaelmas Term, 1729, and that the same be numbered 256 and filed among the rolls of that term, a special entry being first made expressing the day of docketing the same.” This case shows that an entire judgment roll may be supplied, but upon what data does not appear. Judge Haywood, in the case of Hargett & wife vs. -- (2 vol. Hayw. R. 77) .after an able vindication upon principle of the doctrine of the admissibility of parol evidence to establish a lost judicial record, remarks as follows: “ In the time of Lord Coke, (12 Rep. 5,) length of possession proved by parol testimony, was received as good evidence of the contents of a lost record; and there it is said tempus est edax rerum and records and letters patent and other writings either consumed or are lost: and God forbid that ancient grants or acts should be drawn in question, although they cannot be shown. (12 Vezey 389.) Lord Hard-wick says the rule is that the best evidence must be used that can be had; first, the original; if that cannot be had, you may be let in to, prove it in any way and by any circumstances the nature of the case will admit: this, says he, extends not only to deeds but to records. In Cooper 109, Lord Mansfield, speaking of a lost record, says, if a foundation be laid that a record or deed existed and was afterwards lost, it may be supplied by the next best evidence to be had. Hardress 323, 324. Alla. 18. 2 Nels. Abr. 759. Plow. Com. 411. Trials per pais 174, 156, are all to the same effect; but I choose to rely upon the three first cited authorities, because of the credit they derive from the great characters and abilities of those who made the decisions. Records and deeds were ordained for the same purpose, that of exhibiting with certainty to future times a true state of facts; and being equally liable to loss and destruction, it seems to be a just conclusion that what is evidence in the absence of a lost deed, is also evidence in the absence of a lost record. There is no quality peculiar to a deed to impress its contents upon the mind of a witness more distinctly or indelibly than there is to a record — in truth, a deed is less calculated for such a purpose than a record. The latter is usually made up in the presence of by-standers, attentive to what is passing, and of the parties, in the presence of the jurors also who heard the cause, by a sworn officer skilled in using terms the most appropriate to signify precisely what is done and all under the inspection of the judges, who are bound by duty to observe all that passes and see that it is related exactly: whereas deeds are frequently executed in the presence of one or two persons only, who are not necessarily to be made acquainted with the contents ; and if such a conclusion be just, then, as it cannot be denied without overruling all authority upon the subject, but that the contents of a lost deed may be proven by parol where there is no copy or abstract, it follows irresistibly that the contents of a lost record may be proven by the same means, where there is no copy nor any abstract to be had. * * *' It is inconceivable why such objections shall prevail in the case of a record when they will not in the case of a deed; and why a title evidenced by a record, which is more capable of ascertainment by parol testimony to the satisfaction of a jury than deeds generally are, shall be utterly destroyed by refusing to hear such evidence of the contents; when a title evidenced by a lost deed shall be preserved and protected by the admission of such testimony. The accidents, which have happened to records in this State, are very numerous : many were destroyed in the late war; many have been lost by the carelessness of the officers, who had them in keeping; and in not a few instances whole offices with all their records have been consumed by fire; and it is believed there is hardly one instance in a thousand where the party has taken a copy. These circumstances render this subject one of great importance in this State since the proposition, which the foregoing remarks are intended to combat, is calculated to operate the extinction of every title held under such circumstances.” These observations of Judge Haywood are so just and so much to the point that we have preferred to extract them rather than to state their purport. In the case of The Inhabitants of Stockbridge vs. The Inhabitants of West Stockbridge, (12 Mass. 400,) where parol evidence was introduced to aid the presumption of a record, the court, by Judge Wilde, say, “ Records generally are to be proven by inspection or by copies properly authenticated; but if there be sufficient proof of the loss or destruction of a record much inferior evidence of its contents may be admitted * * * it cannot be doubted that parol evidence is competent to prove the existence and loss of a record. This then being satisfactorily proven, secondary evidence of the incorporation of the town is clearly admissible by the rules oí evidence.” The case of Littleton Harris et al. vs. Duncan McRae’s ad. (4 Iredell 81,) was where the process, pleading and all the record entries relating to the case — in fine, every thing except a copy of the trial docket made out for the use of the court or the bar — ■ was consumed by fire, the court permitted the whole to be supplied on parol evidence, but this destruction of the record was after issue joined and before trial. In the case of Hilts vs. Colvin, (14 John. R. 182,) parol evidence of a conviction of felony alleged against a witness to show his incompetency was disallowed, because, although the record of the conviction was destroyed, there was better evidence than parol in the certificate of conviction which the statute of New York made it the duty of the District Attorney to transmitió the court of Exchequer. In the case of Jackson vs. Hammon, (3 Caines’ Rep. 496,) where the original nisi prius record and issue roll were lost and could not ¡be found in the proper office, the supreme court, after a lapse of six years, allowed the plaintiff upon affidavits to file a new nisi prius record and postea, to enter judgment and issue execution. The reporter says this was done without opposition, but it seems fully authorized by what was done by Lord Mansfield in the case already cited from 2 Burr. R. 722, after a lapse of thirty years. In the 3d vol. Phil. Ev. Hill & Cowen's notes, top page 1067, note 723 to p. 387, these annotators s ay, “ And generally in case of a lost or destroyed record parol evidence is admissible of its contents, especially where no higher evidence is shown to ex - ist.” And for this these annotators cite the cases of Donaldson vs. Winter, (1 Miller’s Lou. R. 137, 145.) Jackson ex. dem. Taylor vs. Cullum, (2 Blackf. R. 228.) Newcomb vs. Drummon, (4 Leigh’s R. 57, 60.) Adams vs. Betz, (1 Watts R. 427, 428.) Of these the cases in 4 Leigh and 2 Blackford are before us and upon these we will presently remark. In 1 Greenleaf’s Evidence (3d Edition, p. 663, sec. 509,) the rule is thus laid down: “ If a record is lost and is ancient; its existence and contents may sometimes be presumed; but whether it be ancient or recent, after proof of its loss, its contents may be proved like any other document by any secondary evidence, where the case does not, from its nature, disclose the existence of other and better evidence.” And with this he cited, with other cases, three of the four cases cited by Hill & Cowan, including the case in 4 Leigh; and that case is precisely and fully to the point. It was an action of debt upon a judgment, the entire records of which had been destroyed by fire. The declaration excused the production of the record of the action and judgment by stating that, since the judgment was rendered, the clerk’s office had been consumed by fire and his record had been wholly destroyed. The main objection saved by bill of exception was that a record was allowed to be proven by parol evidence. And it may here be remarked upon this case, as a feature giving it greater strength in sustaining these authors and our views, that there is a statute of Virginia providing for the re-production of lost records under the auspices of commissioners, when they have been destroyed by accident; and it was objected that this should have been first done before an action of debt could be maintained on a lost record; but the court re. garded this statute as only cumulative and not as the foundation of the plaintiff’s right to set up and recover upon this lost record]: and accordingly, when holding the action well brought, the court of appeals, by Tucker, President, say, “ It struck the court, at first, that Drummond could only have been permitted to prove his case by evidence taken under the statute; but as there was no proof that a board of commissioners had ever been appointed and had acted, and as independently of the statute a record, which had been burnt or destroyed, may be set up by parol evidence according to the common law, there is no ground of objection on that score.” The case cited in 2 Blackford R. 228, is scarcely less in point. It was ejectment and upon the trial of the cause in the circuit court, after the plaintiff there had proved a legal title in himself, the defendant offered parol evidence of an outstanding title founded upon a judgment, an execution, a levy, sale, sheriff’s deed and a return of execution, all of which had been destroyed by fire. The plaintiff objected to this evidence, but his objection was overruled and this was the only error complained of. The supreme court of Indiana sustained the circuit court and Judge Scott, in delivering the opinion of the court, remarked, “ On the subject of evidence the general rule is that the best attainable evidence shall be adduced to prove every disputed fact. The effect of this rule is that, when from the nature of the transaction superior evidence may be presumed to be within the power of the party, that which is inferior will be excluded. But when it is manifest that evidence of a higher grade is not within the power of the party, that of a lower degree will be received; and the general rule never excludes the best evidence which can then be produced (1 Stark. Ev. 391.) In conformity to this rule it has been held that if a recovery in ancient demesne be lost and the roll cannot be found, parol evidence may be resorted to. 1 Stark. Ev. 159.” In each of these two cases 1 Stark. Ev. 159 is cited as authority, and this author for his position on this question, among other authorities, cites an anonymous case in 1 Yentris, 257, which was an ejectment for lands in ancient demesne, where a recovery in the court of ancient demesne to cut off an entail was set up, and it was objected that no sufficient evidence of it was produced as “neither the recovery itself nor a copy oí it was shown: for in truth it was lost. But the court did admit other proof of it to be sufficient and said, if a record be lost it may be proved to a jury by testimony, as the decree in Henry VIIPs time for tithes in London is lost, but yet it hath often been allowed that there was one.” After looking at this question then both in the light of principle and of authority, and feeling perfectly clear upon principle and thinking also that we are sufficiently sustained by authority, wre overrule so much of the case of Smith vs. Dudley as declares parol evidence inadmissible under any circumstances to prove the contents and establish a lost or destroyed record: and declare the law to be that, whether a record be ancient or recent, after proof of its loss or destruction satisfactory to the court, its contents may be proved like any other document, by any secondary evidence, when the case does not, from its nature, disclose the existence of other and better evidence. The complainant then had ample remedy at law to recover the debt in the name of Duncan for his own use and could not have come into equity for relief solely upon the ground that the record had been lost or destroyed and that parol evidence only remained to establish the debt. In such case however he might have offered in his bill a bond of indemnity to the defendant not only against the lost records, but also the damages and accumulated expenses of another suit and he would have thereby entitled himself to relief in equity, as the foundation of chancery jurisdiction in cases of lost evidences of debt in general is the power to compel indemnity, which a court of law cannot do. Mitford’s Chancery Plead. (6 American Ed. 1849, p. 135, note 1.) Truly et al. vs. Lane et al. (7 Smedes & Mar. R. 325.) Smith et al. vs. Walker et al. (1 Smedes & Mar. Ch. R. 432.) But the case at bar is predicated upon another and distinct ground of equitable interposition, which, although inartificially set out in the frame of the bill, is believed to be sufficiently so in substance to entitle the complainant to the relief sought. And that is that he presents himself as a trustee for creditors and as such seeks the aid of the chancellor to enable him to realize an equitable interest in a contract vested in him as trustee for the use of the cestui que trust. Thus seeking in his own name the enforcement of an equitable title and invoking the aid of chancery in the establishment and execution of his trust. Conway, Ex parte, 4 Ark. p. 336, 337. 6 Munford 23. We have therefore been unable to discover any substantive error in the action of the court below and its decree must be affirmed with costs.